# 26-943, 26-944

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

---

United States of America,
*Plaintiff-Appellee,*

*vs.*

Rachel Cherwitz, Nicole Daedone,
*Defendants-Appellants.*

---

On appeal from the United States District Court
for the Eastern District of New York

---

## *AMICUS CURIAE* BRIEF FOR EUGENE VOLOKH

---

Matt Kezhaya
Kezhaya Law PLC
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
matt@kezhaya.law
(612) 276-2216

# TABLE OF CONTENTS

Table of Contents ........................................ 2
Table of Authorities ........................................ 3
Interest of *Amicus Curiae* ........................................ 5
Summary of Argument ........................................ 6
Argument ........................................ 8
I. A theory of "spiritual coercion" violates the Free Exercise Clause ........... 8
II. The trial itself was not religiously "neutral." ........................................ 15
III. Defendants were not charged with commercial sexual practices. ......... 19
Conclusion ........................................ 21

# TABLE OF AUTHORITIES

## Cases

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) .................................................................... 8

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*,
494 U.S. 872 (1990) .................................................................... 8

*Fowler v. State of R.I.*,
345 U.S. 67 (1953) ...................................................................... 8

*Marsh v. Chambers*,
468 U.S. 783 (1983) .................................................................. 17

*Masterpiece Cakeshop v. Colorado C.R. Comm'n*,
584 U.S. 617 (2018) ...........................................................15, 17

*Patrick v. LeFevre*,
745 F.2d 153 (2d Cir. 1984)......................................................... 8

*Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*,
819 F.2d 875 (9th Cir. 1987)...................................................... 12

*Reynolds v. United States*,
98 U.S. 145 (1878) ...................................................................... 8

*Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*,
450 U.S. 707 (1981) .................................................................. 16

*United States v. Ballard*,
322 U.S. 78 (1944) ........................................................14, 17, 18, 19

*United States v. Helbrans*,
No. S219CR497NSR0102, 2021 WL 4778525 (S.D.N.Y. Oct. 12, 2021)... 17

*United States v. Seeger*,
380 U.S. 163 (1965) .................................................................. 18

*W. Virginia State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ....................................................................10, 18

**Statutes**

18 U.S.C. § 1589 ........................................................................................ 7

Tex. Penal Code Ann. § 39.03 .................................................................... 20

**Other Authorities**

Eugene Volokh, *A Common-Law Model for Religious Exemptions*, 46 UCLA L. Rev. 1465 (1999) .............................................................................. 5

Eugene Volokh, *Addiction to Constitutionally Protected Activity: Speech, Press, and Religion*, 75 Emory L. J. 1175 (2026)......................................... 5, 12, 13, 14

James Madison et al., *Remonstrance Against Religious Assessments* (reproduced in full at *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 63–72 (1947)) ........... 13

# INTEREST OF *AMICUS CURIAE*

*Amicus curiae* and Professor Eugene Volokh[1] has considerable expertise in the study of the First Amendment and is one of the few academics who has long maintained that *Employment Div. v. Smith* was correctly decided.[2] *See* Eugene Volokh, *A Common-Law Model for Religious Exemptions*, 46 UCLA L. Rev. 1465 (1999). This case is of interest to Prof. Volokh because it raises a question about the line between permissible governmental regulation of social harm and impermissible governmental suppression of religious activity. Prof. Volokh just wrote on the topic in context of social media regulation, arguing that while religious activity could be described as "addictive" just as easily as social media, it cannot be regulated consistent with First Amendment values. *See* Eugene Volokh, *Addiction to Constitutionally Protected Activity: Speech, Press, and Religion*, 75 Emory L. J. 1175 (2026) (for brevity, "***Addiction***").

---

[1] Pursuant to FRAP 29(a)(4)(E), undersigned counsel affirms that no counsel for any party authored this brief in whole or in part and that no person or entity other than amici or their counsel made a monetary contribution intended to fund the preparation and submission of this brief.

[2] *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872 (1990) holds that there is no Free Exercise violation when a "neutral" and "generally applicable law," including a criminal law, incidentally infringes on protected Free Exercise activity unless the Free Exercise issue is paired with another constitutional right.

## Summary of Argument

Under the Government's theory of spiritual coercion, people who at one point believed that volunteering for a religious organization is the path to enlightenment or salvation, but who later become disillusioned with their former beliefs, can be found to have been retroactively "coerced" into providing that labor. The same logic could apply to nuns who had felt religious pressure to do the educational or nursing work that their order was known for, or to monks who had felt religious pressure to do agricultural work that supports the monastery. Any religious organization that runs a monastery, convent, or any other institution where adherents are expected to work as part of their religious vocation could likewise face felony prosecutions.

Such a theory of criminal liability violates the Free Exercise Clause because it is not "neutral." Governments depart from neutrality not just when legislators pass laws designed to suppress religion, but also when courts enforce otherwise-neutral laws in ways that suppress religion precisely because of spiritual or religious qualities. Liability in this case turned precisely on the religious nature of the allegedly coercive conduct, and was imposed in the absence of any secular coercion such as violence or the threat of violence.

The sexual subject matter and conduct inherent within OneTaste's beliefs and practices is beside the point. The forced labor statute is not limited to sexual labor. 18 U.S.C. § 1589. Rather, it generally prohibits any "labor" obtained through "threats of serious harm." 18 U.S.C. § 1589(a)(3). Indeed, the "labor" subject of this charge was ordinary, non-sexual administrative work entailed in running a religious organization that features events and communal living.

To be sure, laws that restrict *sexual* labor will usually be neutral and generally applicable, precisely because they do not turn on any claims of religious or spiritual coercion. If any business, religious or not, offers its employees' sexual services in exchange for money, that might well violate generally applicable bans on prostitution or pandering. Likewise, if any business, religious or not, conditions employment on the employee's performing sexual services, that will usually constitute civilly actionable *quid pro quo* sexual harassment. And enforcing such laws would not jeopardize ordinary religious labor, precisely because they are focused on a narrow range of secularly-defined behavior that is seen as harmful (the exchange of sex for money or employment) rather than on a theory of spiritual coercion that can apply to a wide range of labor.

But such laws were not used in this case. The essence of this charge was punishing a particular religious group. The Court should vacate the convictions, or at least reverse and remand for a new trial with proper limiting instructions.

# ARGUMENT

## I. A theory of "spiritual coercion" violates the Free Exercise Clause.

The Free Exercise Clause of the First Amendment prohibits governments from targeting specific religious beliefs or practices as such. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). That prohibition bars more than just legislative enactments expressly targeting religion; it extends to criminal prosecutions that apply facially neutral laws in ways that target disfavored religious beliefs. *Fowler v. State of R.I.*, 345 U.S. 67 (1953).

Of course, as Part III will discuss, "neutral" and "generally applicable" criminal statutes may be applied to religious behavior precisely the same way they are applied to secular behavior; otherwise, each of us would "become a law unto himself." *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 885 (1990); *see also Reynolds v. United States*, 98 U.S. 145, 167 (1878). But this power cannot be used to target religious actions because of their religious or spiritual character.

The threshold inquiry is whether the ideas are, within OneTaste's scheme of things, "religious." *See Patrick v. LeFevre*, 745 F.2d 153, 158-59 (2d Cir. 1984). Indisputably, Defendants, OneTaste, and adherents of OneTaste (including the so-called victims) all considered the doctrines subject of this criminal trial to be

"religious." See A-977 ("We believed that … *your path to God* was through your orgasm") (emphasis added); see also A-1053 (adherents of OneTaste seek "something more" beyond ordinary existence believe "Our most potent biological drive, Orgasm, is the key to unlocking this power.").

OneTaste's doctrines addressed distinctions between the physical and spiritual realms in a dichotomy between the "third dimension" and the "fourth dimension." See A-694. They addressed issues of worldly suffering and promised both enlightenment and transcendence through ceremonial rites. A-1114 (orgasm "was more about energy," borrowing from "Buddhist principles like the concept of qi"); see also A-1446 ("OneTaste teachings integrate the principles of mindfulness with the practice of orgasm"); A-1089 (OneTaste teachings included sex "as a ritual practice" and "Magic School … where we had sort of like priests and priestesses of orgasm"); see also A-1426-1427 (PowerPoint presentation outlining "Alchemize shadow into power through orgasm" and "Orgasm Magic: Bringing out the elements of magic [and] Put the principles of OM into practice in creating what you want … [including] Rituals and ceremonies"). Specific ceremonies described in the record include a marriage ceremony at A-891, a foot soaking ritual at A-1085, and a shower ritual at A-1152. The central ritualtenet of OneTaste was ritualistic sexual activity is, OMing, or "Orgasmic

Meditation," which adherents of OneTaste regard as a mindfulness practice, a "meditation on sensation without a goal," A-577, A-785.

The Government made much of the sexual nature of those beliefs and practices. E.g., A-1229. But it is no business of the government, including the courts, to "prescribe what shall be orthodox in … religion." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Because OneTaste and its adherents considered these beliefs and practices to be "religious" within their scheme of things, the Free Exercise Clause protects their beliefs and practices from governmental targeting.

And the Government did not seriously contest OneTaste's religiosity; instead, it acknowledged, and even stressed, the spiritual and religious nature of OneTaste's activities. According to the Government's closing arguments, the essence of the charge was that "the defendants indoctrinated the victims to believe that Nicole Daedone was a guru and that her teachings were the path to enlightenment and spiritual growth." A-1222. Prosecutors took issue that "Nicole Daedone taught that orgasm was God." A-1232. And "[n]early all of them [victims] lived in OneTaste housing and were subjected to these teachings incessantly." A-1234. The complained-of "indoctrination" and "teachings" is the very essence of religion: leading adherents to accept doctrines as spiritual truths. That these supposed victims ordered their lives in accordance with OneTaste's

beliefs and practices is evidence of spiritual and religious belief, not of criminally punishable coercion.

Had there been evidence these "victims" were *physically coerced* into accepting OneTaste's religious doctrines, such physical coercion would certainly have been illegal. But that was not the Government's theory. Each of these so-called victims freely admitted that they voluntarily joined the organization. A-267-268; A-872-873; A-939; A-1152-1153. And they freely admitted that they voluntarily left it. A-882; A-939; A-1107. The "indoctrination" and "teachings" for which Defendants stood trial only describes proselytization, the very essence of religion, which cannot be criminally punished.

Likewise, the prosecution argued that Defendants "disrupted victims' personal relationships and isolated them from their friends and family." A-1222; see also A-1235 (victims "felt like OneTaste was all they had"). More particularly, Defendants did so by encouraging some of their adherents, including these "victims," to live in a commune with other like-minded believers. A-262, 359-60, 775, 893-894, 1004-06. But this disruption likewise stemmed not from physical coercion or threats of violence, of deportation, or of other secular harm. Rather, it stemmed from the adherents' sense of the spiritual value of participating in a particular religious and spiritual community. A-872; A-1008-1009 (Ms. Kandell, particularly, described her time at the commune as "one of the greatest

experiences of my life," partly because of "the sense of community" and "the focus of the communal living"); A-1138-1139.

This is a commonplace practice among many religious orders. By definition, any follower of any monastic tradition could be described as having their personal relationships "disrupted" or becoming "isolated" from their less committed friends and family. Volokh, *Addiction*, 75 Emory L. J. at 1190. Nor does it say anything that a religion discourages association with non-adherents, as many religious groups do. *E.g., Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 883 (9th Cir. 1987) ("The harms suffered by Paul as a result of her shunning by the Jehovah's Witnesses are clearly not of the type that would justify the imposition of tort liability for religious conduct. No physical assault or battery occurred.").

The Government also invited the jury to convict because Defendants "financially harmed victims by driving them into debt and not paying them for their labor." A-1222. More specifically, the Government stressed that Defendants accepted, and even encouraged, these "victims" to volunteer their services to their chosen religious organization. A-908-910; A-1028-1030; A-1095-1103. But these "victims" were not coerced or defrauded into performing these volunteer services; they knew full well that their services would be unpaid, and they still chose to volunteer their efforts. A-947-48; A-1152-53; A872-76. This too is

commonplace among religions: Under our constitutional tradition, it is a defining feature of religion that it relies on charitable contributions of money, goods, and services from its adherents. *See generally* James Madison et al., *Remonstrance Against Religious Assessments* (reproduced in full at *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 63–72 (1947)). Indeed, many religions call for participants to tithe 10% of all their secular income. See Volokh, *Addiction*, 75 Emory L. J. at 1180 n. 5. But for First Amendment protections, a hostile jury could punish that practice as extortion because of religious pressure constituting "the threat of social ostracism or eternal damnation, or from the promise of community or of eternal." *Id.*, at 1180.

The crux of the Government's charge was that the Defendants "forced" the purported victims to perform voluntary services through religious indoctrination and, more generally, made them feel reliant on OneTaste. See A-1236 (victims "felt like their whole world was OneTaste. It was their community, their friends, where they worked, and where they lived. And the defendants did all of this by design"). But such feelings of deliberately induced reliance on a religious community are entirely unremarkable in the religious context. *See* Volokh, *Addiction*, 75 Emory L. J. at 1183 (observing that a common technique among many religions is to "slowly lur[e] people into a community and a belief system that they

may eventually find emotionally hard to leave, even if they feel some desire to leave").

Many Christians preach eternal damnation without Christ. Buddhists preach eternal suffering without dharma. Latter-day Saints encourage extensive participation in church callings, missionary service, and a tightly integrated congregational life. Countless religious traditions promise spiritual fulfillment, enlightenment, or eternal happiness through faithful adherence to their beliefs and practices. *See* Volokh, *Addiction*, 75 Emory L. J. at 1180, 1190. Many religions cause each of us to act and believe in ways non-adherents of our chosen path would find to be irrational or even "rank heresy." *See United States v. Ballard*, 322 U.S. 78, 86 (1944).

It is no answer for the Government to charge that these so-called victims felt "compelled" to perform the subject services because that compulsion was the product of religious conviction. If each of us are to be entrusted with the right to enter and exit our chosen religions at will, then each of us must also accept the risk that our chosen religions may cause us to donate time, money, or goods. The Court should find that the Free Exercise Clause prohibits this conviction.

## II. The trial itself was not religiously "neutral."

Government's enforcement action, even under a facially religion-neutral generally applicable statute, violates the Free Exercise Clause when the enforcement of the statute is itself not "neutral," *See Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 634 (2018). In *Masterpiece Cakeshop*, the government sought to enforce Colorado's public accommodations statute in part because of the religious motivations of a baker. Commissioners departed from neutrality by describing the baker's religious beliefs as "despicable" and characterized them as merely rhetorical. *Id.*, at 635. Even "subtle departures from neutrality" on matters of religion are prohibited, not just when a legislative branch enacts a law but also when the executive branch enforces it. *See id.*, at 638.

Just as in *Masterpiece Cakeshop*, the record in this case is replete with denigration of this particular religion. Ms. Gupta invited the jury to scrutinize OneTaste's vocabulary and the specific doctrines as evidence of wrongdoing. A-1232. She emphasized the specialized use of words or phrases "TurnON" (which seemed symnonymous with the yoga phrase "state of flow"),[3] "muggles" (meaning non-adherents of OneTaste),[4] "matrix" (referring to "my fake reality

[3] See A-717.

[4] See A-291.

of problems"),[5] and "tumescence" (in the specialized spiritual sense of "bad energy that you were holding onto"),[6] and the dichotomy between the "third dimension" (the "concrete world") and the "fourth dimension" ("the higher plane"),[7] and asserted these words or phrases were being used to "indoctrinate the victims." A-1232, A-1235. This argument directly invited the jury to judge unfamiliar or strange religious concepts as proof of religious illegitimacy, which neither prosecutors nor jurors may do. *See Masterpiece Cakeshop*, 584 U.S. at 639; *Fowler*, 345 U.S. at 70

Religions routinely use specialized phrasing like "saved," "possessed," "called," or "enlightened," which may appear unacceptable or incomprehensible to outsiders. That strangeness does not deprive OneTaste of First Amendment protections and certainly cannot underlie a felony criminal conviction, especially when the phrasing refers to spiritual or transcendental concepts. *See Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 714 (1981). Quite the opposite: Our natural aversion to other religions is why we have tolerance

[5] See A-861.

[6] See A-272.

[7] See A-694.

protections enshrined in the First Amendment to begin with. *See Ballard*, 322 U.S. at 87; *see also Marsh v. Chambers*, 468 U.S. 783, 792 (1983).

The prosecutor also described OneTaste as a "sex cult." A-1223, A-1264. That label was inherently pejorative. *See United States v. Helbrans*, No. S219CR497NSR0102, 2021 WL 4778525, *17 (S.D.N.Y. Oct. 12, 2021) (prohibiting the Government from referring to defendants as being part of a "cult," prohibiting insinuations that "leaders brainwash or force members of the community to behave in or observe their religion in a certain way," and prohibiting "incendiary and irrelevant references" to the religious organization). The prosecutor was using this label as a rhetorical device to persuade jurors that OneTaste's teaching should be regarded with suspicion because they were unconventional. Just like in *Masterpiece Cakeshop*, this label was employed with the impermissible goal of suggesting the illegitimacy of a particular set of religious beliefs and practices. *See* 584 U.S. at 635.

The prosecutor argued, "that's not because OMing was actually spiritual. They connected OMing to spirituality for legal protection, and so people would follow Nicole Daedone's teachings." A-1233; see also A-1381 ("They [Defendants] whittled them [victims] down by . . . indoctrinating them with so-called spiritual teachings and practices."). But what forms of meditation are "actually" spiritual and what are just "so-called" spiritual is not for secular courts to decide.

It is no business of our secular government to "prescribe what shall be orthodox in . . . religion." *Barnette*, 319 U.S. at 642. The Government simply cannot put the legitimacy of religious or spiritual ideas on trial. *Ballard*, 322 U.S. at 86-88. Yet the Government did exactly that by arguing:

> It is not okay to teach your employees that their spiritual purpose is to fuck the war out of men and that if they stray from the [path] set by OneTaste and by Nicole Daedone, they will be spiritually ruined.

A-1284.

And while there is a narrow zone in which a properly instructed jury can determine whether people's religious beliefs are sincerely held, *United States v. Seeger*, 380 U.S. 163, 165 (1965), no such instruction was given to the jury in this case. Quite the contrary, the District Court declined to provide jury instructions that any "alleged threats were covered by the First Amendment." A-1211. The District Court even warned defense counsel against referencing Defendants' First Amendment rights: "I'm not going to let you instruct the jury or even come close to instructing the jury on the First Amendment." A-1212. And the District Court refused to order a mistrial despite that the Government "ask[ed] the jury to hold their spiritual beliefs against them." A-1315-1316 (argument); A-1318 (denial).

The Government's rhetorical devices are a far cry from the neutrality required by *Masterpiece Cakeshop*. The Government was overtly hostile to Defendants' religion in itself and openly invited the jury to judge the legitimacy of OneTaste's religious doctrines and practices. It is no answer that the jury accepted the Government's invitation because the highest law of the land removes that power from legislator, judge, juror, and prosecutor alike. "If one could be sent to jail because a jury in a hostile environment found those teachings to be false, little indeed would be left of religious freedom." *Ballard*, 322 U.S. at 87.

## III. Defendants were not charged with commercial sexual practices.

To be sure, nothing in this argument precludes the application of genuinely neutral laws to regulate commercial sexual behavior. For instance, an organization that sells members' or employees' sexual services for money can still be subject, under *Employment Division v. Smith*, to neutral and generally applicable bans on prostitution. Such laws can be applied without resorting to arguments about spiritual coercion, or claims that the defendant supposedly "indoctrinat[ed people] to believe that [she] was a guru and that her teachings were the path to enlightenment and spiritual growth." A-1222. It would not matter whether the defendant "taught that orgasm was God." A-977. Commercial sale of certain

services that lead to orgasm would be the crime, with no need to address the spiritual significance of the orgasm itself.

Likewise, if an employee claims that an employer required sexual services as a condition of employment, the employee could sue for *quid pro quo* sexual harassment, again a matter that is entirely religion-neutral. Indeed, the government could even criminalize such *quid pro quo* sexual harassment. See Tex. Penal Code Ann. § 39.03 (criminalizing sexual harassment under color of public office).

Unlike with the Government's expansive reading of the coerced labor statute, none of this would threaten religions that have a tradition of monasticism, or of religious labor as a calling. None of this would treat religious or spiritual teachings as "coercion." And none of this would treat such teachings as crimes when they lead people to feel moved, or even spiritually or religiously obligated, to perform certain tasks that are given to them by a spiritual or religious community.

Of course, in this case the Government chose not to prosecute under statutes banning commercial sale of sexual services—perhaps because there was no evidence that money was being exchanged in return for sexual activity. But these laws exist, and deal with genuine commercialization of sex. Likewise, laws banning rape and sexual assault exist, and deal with genuine physical coercion of

sexual acts. There is no reason for a concern about possible commercialization of sex to be used to justify an overbroad reading of coerced labor statutes, which would apply far more broadly than just to sex.

## CONCLUSION

Because the Government's theory of coercion rested in part on "indoctrination" into religious and spiritual beliefs and threats of excommunication from a religious and spiritual community, these criminal convictions cannot withstand Free Exercise Clause scrutiny.

**WHEREFORE** the Court should vacate the convictions and dismiss. Alternatively, the Court should remand for a trial with appropriate instructions to prohibit any reference to activity which is protected by the Free Exercise Clause.

Respectfully submitted on September 25, 2026,

By: */s/ Matt Kezhaya*

Matt Kezhaya (MN # 0402193)
KEZHAYA LAW PLC
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone: (612) 276-2216
email: matt@kezhaya.law

## CERTIFICATE OF SERVICE

**NOTICE IS GIVEN** that I, Matt Kezhaya, efiled the foregoing document by uploading it to the Court's efiling system on September 25, 2026, which sends service to registered users, including all other counsel of record in this cause. Paper copies to follow based on the Clerk's instructions. *s/ Matt Kezhaya*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Second Cir. R. 29.1 (an *amicus curiae* brief may not exceed 7,000 words) because, excluding the parts of the document exempted by FRAP 32(f), this document contains **3,529** words.

This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because this document has been prepared in a proportionally spaced typeface using MS Office 365 in 14pt "Calisto MT" font. Headers are in 15pt "Calisto MT" font.

The electronic version of the brief has been scanned for viruses and is virus-free.
*s/ Matt Kezhaya*